## JOHNSON *v.* UNITED STATES.

No. 273. Argued January 15, 1943.—Decided February 15, 1943.

*Mr. William A. Gray,* with whom *Mr. Benjamin M. Golder* was on the brief, for petitioner.

*Solicitor General Fahy,* with whom *Assistant Attorney General Clark* and *Messrs. Sewall Key, Joseph W. Burns,* and *Archibald Cox* were on the brief, for the United States.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner was convicted of wilfully attempting to defeat and evade his federal income taxes for the years 1936 and 1937. He was acquitted for 1935. Petitioner was a political leader in Atlantic City and Atlantic County, New Jersey. The prosecution's theory was that he had received large sums of money from those conducting the numbers game for protection against police interference and had not reported those sums in his income tax returns for 1935, 1936, and 1937. The defense was that his failure to return all the income he had received resulted from the mistaken but sincere belief that he w as bound to return only the net balance remaining after deducting amounts expended for political purposes. The evidence was that one Weloff and one Towhey, acting alternately, delivered to petitioner on behalf of the numbers syndicate $1,200 a week from July 1935 to November 1937. About November 1, 1937, Weloff and Towhey were displaced by one Jack Southern to whom the syndicate delivered $1,200 a week. Neither the prosecution nor

the defense would sponsor Southern's testimony. At the request of the prosecution the court called Southern as a witness. He testified that during November and December, 1937, he delivered the $1,200 a week to an inspector of police named Ferretti, who was dead at the time of the trial. He denied that he ever made any weekly payments to petitioner. No evidence was adduced that petitioner received any sums from the syndicate during November or December, 1937. Petitioner took the stand and on direct examination admitted that he had received the weekly payments from Weloff and Towhey up to November, 1937. For 1937 these admitted payments totalled $50,400. Petitioner accounted for this sum by stating that he had reported $30,189.99 in his 1937 return as "Other commissions" and that he had paid out the balance, roughly $21,000, as political contributions for that year. On cross-examination he denied that he had received payments from Southern during November and December, 1937.[1] He was then asked "Did you receive any money from numbers in 1938?" Counsel for the defense objected to the question on the ground that it was not relevant to the issue and would tend to prove a different offense than the one charged in the indictment. The court overruled the objection. Petitioner then answered the question in the affirmative. He was then asked, "Who gave it to you?" Counsel for the defense objected. The court had the jury withdraw. The prosecutor asked that petitioner "also be excused from the court room during the argument, and that when he resumes the stand he should do so without having any opportunity to hear what the argument is about." The court said "that is a fair request" and ordered petitioner to retire, which he

---

[1] The indictment charged that the defendant had received $62,400 from the numbers game in 1937. It was the difference between that amount and $50,400 admittedly received which was in dispute.

did. No objection was made to that action. Counsel for the prosecution argued that the questions asked in cross-examination were proper to establish a continuous practice of receiving the numbers income throughout 1937. Counsel for the defense insisted that the cross-examination should be limited to the subjects opened up by the examination in chief. The court expressed the view that the cross-examination was permissible since it bore directly upon credibility. Counsel for the defense then pressed the point that even if it otherwise might be proper cross-examination, nevertheless it was "improper cross-examination for the reason that it is directed to a future prosecution." He asserted that he made the claim of privilege on behalf of the accused "in view of the avowed threat of the government to prosecute him for the very years concerning which he is now asked to testify." The court replied that it was for the accused, not his counsel, to make the claim and added, "You may advise him of his rights, of course, but it is for him to determine whether or not he wishes to take advantage of them." After further argument, the court stated:

"It seems to me that the testimony is perfectly relevant and material as cross examination directed to credibility.

"In view of the witness' testimony, unless it runs afoul of his right not to be required to incriminate himself, it seems to me that that is a right which he may waive or claim, and that that is a personal right that he may be advised by counsel when a question is asked, and that he will have to determine himself whether he is going to claim it or not."

Petitioner resumed the stand. The question "Who gave it to you?" was repeated. Counsel for petitioner then advised him of his constitutional privilege, which he thereupon claimed. The court ruled, "You may decline to answer."

The prosecutor in his address to the jury commented at some length on petitioner's assertion of his constitutional privilege:

I asked him, "Did you get the money in 1938?" and he said, "Yes." Well, of course, then a lot of little things happened. They didn't like that because naturally you say, "Well, I don't understand that, Mr. Johnson." I wish you could have asked him questions then. You say, "Mr. Johnson, you say that suddenly November 1st, 1937 you stopped getting the $1200 from numbers; then in 1938 you started to get it again? How come?" You don't get it, you don't get it because it isn't the truth. That is what cross examination is for.

So then we went beyond that. We said, "Who did you get it from?" He said, "I claim my privilege against self-incrimination. I violated the income tax law of 1938; I don't want to tell you about that. I am having enough trouble with 1935, six and seven." If he could have claimed his privilege on the stand here with respect to 1935, six and seven he would have done it. He would claim anything that is necessary to get him out of any predicament he is in. Well, now, ladies and gentlemen, if he got that numbers money in 1938 who did he get it from? He must have got it from Jack Southern. Maybe he got it from Inspector Ferretti, but he admits he got it. Well, then, if he got it he got it during the last two months of 1937. They didn't say anything about that to you because they were trapped. No need of them talking about it. It is for me to point that out to you.

Now, ladies and gentlemen, can you believe that man told you the truth about anything on the witness stand when he admits that he got numbers money in 1938 but won't tell you who he got it from on the ground it would incriminate him? If you can believe that that man is innocent of this charge when he stands right up in front of you and says he cannot answer a question about 1938, that he just got through

answering for 1937 on the ground it would incriminate him, well, then, I just don't get it.

An objection was made to these statements and overruled and an exception was noted. The next morning before the court charged the jury various other objections were submitted. During the colloquy the court stated that there "were a number of matters referred to last evening . . . I ruled on some of them, all of which rulings I indicated I would reconsider. Now, have you mentioned to me now all the points you desire to refer to?" Counsel for petitioner replied, "We withdraw whatever was said last night . . . I think the only fair thing to do is to forget everything that happened last night and start this morning." The objection previously made to the prosecutor's comment on the accused's failure to testify was not renewed. Nor was any request made to the court to charge the jury to disregard petitioner's refusal to testify. Though the prosecutor's comment on the accused's failure to testify was again adverted to, it was in a different connection. Counsel for petitioner contended that the prosecutor's statement that the claim of privilege amounted to an admission of income tax violation in 1938 was "an entire misconception of . . . the claim of privilege" inasmuch as the basis of the claim "is that the testimony . . . would have a tendency to incriminate him," and "not that it would prove him guilty." The court indicated that this objection was well taken and should be called to the attention of the jury. The court added, "He is not being charged with any 1938 tax." The prosecutor then said, "It is a question of his good faith and his credibility, and the answers he has already given on similar questions. That is the purpose for which the questions were permitted." The court thereupon stated, "I think I probably should indicate to the jury that that is the full extent of it." Counsel for petitioner remained silent, making no objection. No error was asserted in the

motion for a new trial or in the assignments of error on the ground that the prosecutor's comment or the court's charge on the inference from the claim of privilege was improper.

The court in its charge stated that petitioner's refusal to answer the question on the ground that it would tend to incriminate him "may only be considered by you in testing his credibility as to the answers which he did give and his good faith in the matter" and that petitioner was not being tried for anything he did in 1938. To this charge no objection was made.

The Circuit Court of Appeals affirmed the judgment of conviction, one judge dissenting. 129 F. 2d 954. The court held that the exclusion of petitioner from the court room during the colloquy did not result in prejudice; that the cross-examination covering 1938 income was proper; and that the allowance of comment on the claim of privilege was justified. The case is here on a petition for a writ of certiorari.

The case of an accused who voluntarily takes the stand and the case of an accused who refrains from testifying (*Bruno* v. *United States,* 308 U. S. 287) are of course vastly different. *Raffel* v. *United States,* 271 U. S. 494. His "voluntary offer of testimony upon any fact is a waiver as to *all other relevant facts,* because of the necessary connection between all." 8 Wigmore, Evidence (3d ed., 1940) § 2276 (2). And see *Fitzpatrick* v. *United States,* 178 U. S. 304, 315–316; *Powers* v. *United States,* 223 U. S. 303, 314. The cross-examination did not run afoul of the rule which prohibits inquiry into a collateral crime unconnected with the offense charged. *Boyd* v. *United States,* 142 U. S. 450. Inquiry into petitioner's income for 1938 was relevant to the issue in the case. As contended by the prosecution, the receipt of money from the numbers syndicate prior to November, 1937 and after December, 1937 might well support a finding of the jury

that in view of all the circumstances the payments were not in fact interrupted during the last two months of 1937. The amount and source of the 1938 income accordingly were relevant to show the continuous nature of the transactions in question. That line of inquiry therefore satisfied the test of relevancy and was a proper part of cross-examination. See *Cravens* v. *United States,* 62 F. 2d 261, 273; *Mehan* v. *United States,* 112 F. 2d 561, 563; *Weiss* v. *United States,* 122 F. 2d 675, 682; *Bullock* v. *State,* 65 N. J. L. 557, 575. Though the issue might have been more aptly phrased by the court in terms other than credibility, the meaning of the ruling in its context is plain. Thus we may assume that it would not have been error for the court to deny petitioner's claim of privilege. In such a case his failure to explain the source of his numbers income in 1938 could properly be the subject of comment and inference. As stated by this Court in *Caminetti* v. *United States,* 242 U. S. 470, 494, an accused who takes the stand "may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences to be naturally drawn from it." But where the claim of privilege is asserted and unqualifiedly granted, the requirements of fair trial may preclude any comment. That certainly is true where the claim of privilege could not properly be denied. The rule which obtains when the accused fails to take the stand (*Wilson* v. *United States,* 149 U. S. 60) is then applicable. As stated by the Supreme Court of Pennsylvania, "If the privilege claimed by the witness be allowed, the matter is at an end. The claim of privilege and its allowance is properly no part of the evidence submitted to the jury, and no inferences whatever can be legitimately drawn by them from the legal assertion by the witness of his constitutional right. The allowance of the privilege

would be a mockery of justice, if either party is to be affected injuriously by it." *Phelin* v. *Kenderdine,* 20 Pa. 354, 363; *Wireman* v. *Commonwealth,* 203 Ky. 57, 62–63, 261 S. W. 862.   And see *State* v. *Vroman,* 45 S. D. 465, 473, 188 N. W. 746; *Carne* v. *Litchfield,* 2 Mich. 340; *People* v. *McGungill,* 41 Cal. 429.   We also think that the same result should obtain in any case where the court grants the claim of privilege and then submits the matter to the jury, if that action may be said to affect materially the accused's choice of claiming or waiving the privilege and results in prejudice.   The fact that the privilege is mistakenly granted is immaterial.

The ruling of the court gave the petitioner the choice between testifying and refusing to testify as to his 1938 income.   An accused having the assurance of the court that his claim of privilege would be granted might well be entrapped if his assertion of the privilege could then be used against him.   His real choice might then be quite different from his apparent one.   In this case it would lie between protection against an indictment for 1938 and the use of his claim of privilege as evidence that he did in fact receive the income during the last two months of 1937.   Elementary fairness requires that an accused should not be misled on that score.   If advised by the court that his claim of privilege though granted would be employed against him, he well might never claim it.   If he receives assurance that it will be granted if claimed, or if it is claimed and granted outright, he has every right to expect that the ruling is made in good faith and that the rule against comment will be observed.   Certainly the question whether petitioner had received income from the syndicate during November and December, 1937, was an extremely material issue in the case.   As we have noted, petitioner admitted receiving $50,400 from the numbers syndicate during 1937.   And all of this amount according to the testimony was received prior to

November 1, 1937. Of this amount he reported only $30,189.99 in his 1937 income tax return. He testified, however, that he had paid out $21,000 in political contributions for that year. Thus he attempted to account for all the numbers income which he had received that year and defended on the ground that his failure to return the $21,000 was due to his mistaken but sincere belief that he was bound to return only the net balance remaining after deducting amounts expended for political purposes. The indictment, however, charged that he had received $62,400 from the numbers syndicate during 1937. And the prosecution claimed that the weekly payments of $1,200 continued during November and December, 1937. If that were established, it would plainly destroy his defense and would be cogent evidence of his wilful attempt to evade the tax. All of the direct evidence in the record was to the effect that he had not received income from the numbers syndicate during November and December, 1937. There was no basis for concluding that he had unless that fact was to be inferred from the evidence that he had received the income until November, 1937 and that he received it again in 1938. Hence it would be highly valuable to the prosecution and equally damaging to the accused to have his failure to testify employed to bolster such an inference.

It is no answer to say that comment on a defendant's refusal to testify does not in any way place him in jeopardy of being charged with or convicted of the crime protected by his privilege. That may be admitted. The problem here is a different one. It is whether a procedure will be approved which deprives an accused on facts such as these of an intelligent choice between claiming or waiving his privilege. Knowledge that a failure to testify though permitted by the court would be submitted to the jury might seriously affect that choice. If the accused makes the choice without that knowledge, he may well be misled

on one of the most important decisions in his defense. We would of course not be concerned with the matter if it turned only on the quality of legal advice which he received. But the responsibility for misuse of the grant of the claim of privilege is the court's. It is the court to whom an accused properly and necessarily looks for protection in such a matter. When it grants the claim of privilege but allows it to be used against the accused to his prejudice, we cannot disregard the matter. That procedure has such potentialities of oppressive use that we will not sanction its use in the federal courts over which we have supervisory powers.

We are mindful of the fact that there is eminent authority which may be said to represent the contrary view. *State* v. *Ober*, 52 N. H. 459. That case stands for the general proposition that when the accused took the stand "without claiming his constitutional privilege, it was too late for him to halt at that point which suited his own convenience." *Id.*, p. 465. With that rule we agree. Whether the facts of that case and the stage of the proof when the privilege was claimed made the comment on the accused's failure to testify prejudicial, cannot be determined from the report of the case. The point with which we are here concerned was not adverted to in the opinion. Indeed the court stated (52 N. H. p. 465) that the "whole argument of his counsel now proceeds upon the erroneous assumption that the ruling of the court [granting the claim of privilege] was right. That assumption being groundless, his argument fails." But as we have indicated, the problem in this case is quite different.

We have considered this matter at length because the Circuit Court of Appeals ruled upon it and approved the procedure followed by the District Court. But we do not grant a new trial because of one circumstance which seems to us controlling. As we have noted, though an exception was taken to the prosecutor's comment on petitioner's

refusal to testify, it was later withdrawn. And when the court invited counsel to bring to its attention any objections or requests to charge, counsel did not renew the objection. Nor was any request made to charge the jury on the matter. Moreover, though the question of the prosecutor's comment was again adverted to by the defense, the objection was of a wholly different character and one which the court indicated its willingness to correct. And when the court stated what charge it would give the jury on the point, counsel for the defense stood by and voiced no protest or objection. We can only conclude that petitioner expressly waived any objection to the prosecutor's comment by withdrawing his exception to it and by acquiescing in the treatment of the matter by the court. It is true that we may of our own motion notice errors to which no exception has been taken if they would "seriously affect the fairness, integrity or public reputation of judicial proceedings." See *United States* v. *Atkinson,* 297 U. S. 157, 160; *Clyatt* v. *United States,* 197 U. S. 207, 221–222. But we are not dealing here with inadvertence or oversight. This is a case where silent approval of the course followed by the court (*Boyd* v. *United States,* 271 U. S. 104, 108) is accompanied by an express waiver of a prior objection to the method by which the claim of privilege was treated. In such a situation the rule stated by Mr. Justice Sutherland in *United States* v. *Manton,* 107 F. 2d 834, 848, is applicable:

"If the failure to enter an exception or assign error had been a mere inadvertence the matter might stand in a different light. But that view cannot be indulged. Plainly enough, counsel consciously and intentionally failed to save the point and led the trial judge to understand that counsel was satisfied. We see no warrant for the exercise of our discretion to set aside standing rules, so necessary to the due and orderly administration of

justice, and review the challenge to the legal accuracy of the charge where, as here, the failure of the judge to follow the text of the requested instruction was, at the last, induced by the action of counsel . . ."

Any other course would not comport with the standards for the administration of criminal justice. We cannot permit an accused to elect to pursue one course at the trial and then, when that has proved to be unprofitable, to insist on appeal that the course which he rejected at the trial be reopened to him. However unwise the first choice may have been, the range of waiver is wide. Since the protection which could have been obtained was plainly waived, the accused cannot now be heard to charge the court with depriving him of a fair trial. The court only followed the course which he himself helped to chart and in which he acquiesced until the case was argued on appeal. The fact that the objection did not appear in the motion for new trial or in the assignments of error makes clear that the point now is a "mere afterthought." *United States* v. *Manton, supra,* p. 847.

The remaining objections may be briefly disposed of. It is claimed that the expulsion of petitioner from the court room while counsel were arguing the question of the propriety of the cross-examination on his 1938 income deprived him of his right to be present during the trial. Cf. *Snyder* v. *Massachusetts,* 291 U. S. 97. It is also urged that petitioner was denied the advice of counsel in that the court directed that when he resumed the stand he do so without having an opportunity to confer with his counsel about claiming the privilege. But there is a simple answer to these objections. Not only were no exceptions taken to these rulings; it also appears that they did not result in a loss of the privilege which the court had indicated it would recognize. For when petitioner resumed the stand, he was advised of his right to claim the priv-

ilege, he claimed it, and it was granted. Accordingly we cannot see where any prejudice resulted even if we assume, *arguendo,* that the rulings of the court were not correct.

*Affirmed.*

MR. JUSTICE MURPHY and MR. JUSTICE JACKSON did not participate in the consideration or disposition of this case.

MR. JUSTICE FRANKFURTER, concurring:

In reviewing criminal cases, it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

An examination of the entire record of the proceedings leaves me without doubt that Judge Maris conducted the trial with conspicuous fairness, and that he committed no error in the rulings complained of unless it be one in favor of the defendant. In allowing the defendant to withhold testimony regarding gambling receipts for 1938, the trial court, in recognizing the threat of future prosecution of the defendant for evading taxes in that year, was exercising a merciful discretion. For this avenue of inquiry plainly was relevant to the truth of the charges against Johnson in the present proceeding. In view of all that took place at the trial, to have denied the jury an opportunity to consider the significance of the defendant's desire not to testify regarding gambling receipts in 1938 would have been to withhold from them a factor relevant in determining whether Johnson's explanation of what he did with the "protection" money received by him in 1936 and 1937 was the truth or just a cock-and-bull story.

That the defendant's senior counsel, a lawyer of long experience in federal criminal practice, did not take exception to the manner in which Judge Maris tempered concern for the proper administration of justice with solicitude for the rights of the defendant, indicates not "waiver" of a right which had been denied but recognition that the action of the trial judge was unexceptionable. The claim that the trial was conducted improperly is obviously an afterthought. Only after conviction and in an effort to upset the jury's verdict on appeal was the fair conduct of the trial court sought to be distorted into an impropriety.